at all. It's a consolidated case with 20-5897, 20-5920, 20-5946, and 20-6010. Oral argument not to exceed 34 minutes to be shared by the defendants and 30 minutes for the plaintiffs. Mr. Rosenberg will be arguing first for the appellant. We welcome you all to the court by Zoom. Mr. Rosenberg, have you requested your rebuttal time? Yes, I request two minutes of rebuttal time. Okay, thank you. Proceed. May it please the court, Lawrence Rosenberg on behalf of defendant Jerry Wayne Wilkerson, and I'm also going to later introduce Ashley Stephens, who is one of my law students. I'm going to handle the fraud claims. Ms. Stephens is going to handle the anti-kickback claims, and we believe they apply pretty much to all the defendants. We're going to focus on Mr. Wilkerson. This case involves a classic example of governmental and prosecutorial overreach. The defendants were convicted for conduct that quite simply is not illegal. On the fraud counts, I have two main points. First, there was no fraud, and secondly, there was sufficiently no mens rea sufficient for criminal liability. But to begin, I want to cover two points very quickly. One is the structure of the industry that we're talking about, and the second is the theory of fraud of the district court. The industry had the following players. There were manufacturers who set the cost of ingredients for compounded drugs, insurers who agreed to cover the costs of those drugs, pharmacies who entered into agreements with sales representatives to advertise prescriptions that insurers agreed to cover and that themselves formulated the drugs, medical professionals who wrote prescriptions, and pharmacy benefit managers or PBMs who submitted the prescriptions for reimbursement to the insurance companies and were supposed to verify that the prescriptions were legitimate. In this case, the district court held that the sales representatives, who had no relationship whatsoever with the insurers and had no duties to the patients, were somehow liable for a breach of a duty to disclose. And I want to make very clear, the district court repeatedly said that it was finding liability based on a failure to disclose. And if I could just read a couple of sentences from the district court, from the record, this is from record 546, page ID 11-12-70-71. The court said, I think we have a misunderstanding of what was found to be fraudulent in this case. I'm not sure in my mind it deals so much with medical necessity. I mean, the ingredients for these creams that I heard, I mean, there is no question they were legitimate ingredients. And then he goes on. Mr. Rosenberg, may I interrupt? I think I understand your argument that there was a loss to the insurers because of the way this was just set up. They had essentially a bad business deal. But I guess the concern is that were it not for the actions of your client and the other defendants, there wouldn't have been these purchases of the product. And so there's evidence of conduct that certainly misled as to certain things. For instance, the fact that there was to be an evaluation or a clinical trial with regard to the product, I don't believe there's any evidence that that ever occurred, is there? It did not occur, Judge Bush. And I don't know if you're finished with your question, but let me just say the key is the district court said there was a duty to disclose. These other what I would call extraneous facts that the government relies on were not central to that duty to disclose. And with respect to the trial, we cited a number of medical sources on pages 14 and 15 of our reply brief that asking patients to participate in a study, even if a study may ultimately not actually happen, is not illegal. It's standard in the medical profession. But isn't that fraud, though? If you're not going to do a study and you say there is going to be a study, isn't that fraud? That's not omission. That's an affirmative misrepresentation, isn't it? No, there was a possibility of a study. It just never ultimately came together. All the time, doctors ask patients, I've had it happen to me, ask patients if I'd consent to use my medical data for a study, and then the study never happens because it just doesn't go anywhere. Mr. Rosenberg, I understand your argument. And were these creams that people needed and wanted, and there was a discussion about a study that didn't happen, I think your argument would make a lot of sense. But when we have these pre-signed, pre-printed forms for patients that doctors never saw, and outrageous prices for these things, it's just really hard, I think, to overlook what really happened here to buy your argument that somebody wasn't defrauded about something. But Judge McKeague, again, those facts apply to a very small percentage of the prescriptions. So the vast majority of the prescriptions, Nurse Craven testified at trial, the patients were discussed, it was discussed with the patients, she reached out to the patients. In every instance that I'm aware of, the patients filled out forms to indicate their interest in these creams, and Nurse Craven and the other prescribers relied on the form, and in the vast majority... Let's assume that it was a small percentage. I mean, fraud is fraud. You don't have to have defrauded every patient here to be guilty, do you? But it's not fraud if Nurse Craven reasonably believed that these creams were going to be beneficial to the patients. Is it not true that there were reimbursements made in connection with creams sent to patients that Nurse Craven never saw, never talked to? Never talked to, yes, some, but not very many. And the point is that she still saw the forms, and we have every reason to believe she still saw the forms indicating a need for the drugs. Nurse Craven testified that these were extremely efficacious in her view, and that she testified that while it was a bad practice very early on not to actually talk to some of these patients, she still, you know, there was no indication that these were medically unnecessary. And again, it was up to the medical provider, Nurse Craven or one of the other prescribers, to make sure that she assured herself of the medical necessity. My client isn't a doctor. How could she assure herself of the medical necessity if her forms were signed with a stamp? First of all, she may have authorized, she did authorize people at some point to use the stamp on her behalf. And again, the only evidence was that at the very beginning, there were some stamped prescriptions. But then Nurse Craven told my client, Mr. Wilkerson, that she wasn't comfortable with that, and then it stopped. That was her testimony. So we're talking again about a very small percentage. We're talking about thousands of prescriptions overall in this case. And these pieces of evidence the government is raising apply to maybe a few dozen of the prescriptions. And if, according to the questions, there really was fraud with respect to those few prescriptions, this case would absolutely have to be remanded, at least for resentencing. Because the district court never allowed the defense to show that there were legitimate prescriptions versus the ones that might have been illegitimate. Because the district court's theory was everything was fraudulent because the price wasn't disclosed to insurers who already knew the price, or to patients who got the price in their explanation of benefits and only paid a standard co-pay, if that. Didn't your client have the duty to sentencing, though, to prove that, which were legitimate and which were not? Wasn't that your burden? That would be our burden, but the judge never gave us that opportunity because his theory of fraud was that everything was absolutely fraudulent because of the duty to disclose. We couldn't have put on evidence at trial that we did disclose the price because we didn't. It was just a completely fallacious theory of fraud, which is why we believe the district court's ruling has to be overturned. Before you move from that, isn't part of the problem here the agreement not to have the findings of fact? Why in that situation wouldn't we look to affirmative misrepresentations? I know you say that the judge mentioned and referenced omissions, but in fact, this is a case in which the record clearly supports affirmative misrepresentations. Why isn't that adequate without a list of differentiating factual findings? So why aren't misrepresentations sufficient? So, for two reasons, Your Honor. First, because the district court said he was doing omissions. It specifically said in the record, 545 page IV 11163, that he was putting his findings on the record of sentencing. So, quote, if for no other reason than Lennice's appeal, the Sixth Circuit can figure out what the hell the court did. And so the court was making it clear that he was telling you, this is what I did. It was the omissions, not the affirmative misrepresentations. And secondly, with respect, the evidence of affirmative misrepresentations is very few and far between, and most of which doesn't relate to my client. Mr. Wilkerson, there's no thing tying Mr. Wilkerson to any study or any claims of a study. Zero. Zip. No evidence. There's no evidence that Mr. Wilkerson, for example, told any of the other sales reps to pay co-pays or pay commissions or pay anything for patients to use the dress. So most of the supposed affirmative misrepresentations the government relies on simply have no connection to Mr. Wilkerson. And if I may, there are four key factors that the cases say are necessary for health care for one widespread, absolutely false claims, which isn't true here. That was in the Brian case, for example, judgment that you sat on last year. Second, payment of prescribers on commission that didn't happen. Nurse Craven was paid on salary, not on commission, not as a specific safe harbor in the regulations under 42 CFR 1001.952I. I'm sorry, was she paid on salary throughout the entire case? Except for the first month as karma was being set up and she was paid five thousand dollars, which was effectively her monthly salary once karma was starting up. So so she wasn't paid on salary, per se, because karma didn't exist. But that was it. That was in the month or two before karma was founded. She was paid a thousand five thousand dollars, which was effectively her monthly salary. Does it not matter that that was in the course of the establishment of the conspiracy to do this? Well, I don't think it matters because I think it's equivalent to paying her on salary. And so I think the safe harbor would still apply because it was the same payment she got on salary later for about a month's worth of work, including helping to start up and including evaluating some of these prescriptions. Third, it's critical that nurse Craven testified that she was exercising her medical judgment when she was writing these prescriptions. And fourth, there was a lack of coercion. The testimony was that Mr. Wilkerson didn't force her to do anything. And when she at one point early on said, I'm not comfortable writing prescriptions without seeing patients, she immediately started talking to the patients. That was her responsibility, and that's what she did. I see my time's running out. If I could just briefly address the mens rea point. There are several reasons. There are several reasons to believe that Mr. Wilkerson did not operate with criminal mens rea. Number one, the evidence of trial from Tabor and Newkirk is that these kind of arrangements were standard in the industry and everyone in the industry knew that. Secondly, the testimony from Kurtz is that he and Wilkerson consulted with attorneys to make sure that they were comfortable that what they were doing was legal. Third, the testimony from Tabor is that at least one of the pharmacies in this case also consulted attorneys to make sure that what they were doing was legal. So for all of these reasons, number one, there was no failure to disclose. Let me stop you right there and just ask you a quick question about the consulting attorneys. My understanding has always been that somebody simply saying they consulted an attorney so therefore they don't have the requisite mens rea doesn't get you anywhere unless you put into evidence who you talk to. And most importantly, what you disclose to the attorney before you got what you claim to be a blessing to go ahead and do what you're doing. My understanding from the record is that there's nothing in the record to that effect. Am I wrong? You're not wrong, Judge McKee. You're absolutely right. There was no formal advice of counsel defense, but that goes to a good faith defense. I think it still goes to mens rea that they consulted attorneys and were comfortable after that, that what they were doing was legal. It still goes to their intent not to commit a criminal act. And this context is different because the statute says you have to knowingly and willingly commit health care fraud. I think what you're referring to is the general rule that generally applies when a statute isn't as specific with an intent requirement. And so we believe that in this particular circumstance with a higher level of intent required that the consultation with attorneys is relevant. I see that my time is up. You'll have your rebuttal time. OK, I'll reserve for rebuttal. And if I could, I'd like to introduce Ashley Stevens. She is a qualified third year law student at West Virginia University College of Law and our Supreme Court clinic. And she will be addressing the anti-kickback claims. Thank you very much. May it please the court. Mr. Wilkerson's convictions under the federal anti-kickback statute should be reversed for two reasons. First, Mr. Wilkerson did not possess the mens rea required to uphold a conviction under the anti-kickback statute. And second, the type of promotional activities Mr. Wilkerson engaged in do not amount to anti-kickback violations. Turning to my first point to establish that Mr. Wilkerson violated the anti-kickback statute, the government had to prove beyond a reasonable doubt that Mr. Wilkerson knowingly and willfully offered to receive something of value in exchange for referring an individual to another for federally reimbursable goods or services. The heightened mens rea standard under the kickback statute. What evidence do you have? Is there regarding Mr. Wilkerson's knowledge of payments being made to patients? What evidence is there on the record? Your Honor, there is, I believe, no evidence that Mr. Wilkerson actually knew that some of his underlings or subcontractors were making any sort of payments to patients beyond the couple of instances where Mr. Wilkerson did cover a few patients' co-pays. But covering co-pays is not illegal, and the government presented no legal statute or regulation that prohibits a party from covering someone's co-pay, particularly in these circumstances where third parties do it all the time and where certain insurances don't even require co-pay. And I think it's clear from the record that, in this case, Mr. Wilkerson did not possess records of mens rea for several reasons. A few of them Mr. Rosenberg already touched on, including the fact that these types of arrangements were widespread and standard in the industry and that Mr. Wilkerson consulted. What about the commissions that were paid to Mr. Wilkerson by the pharmacies? Why aren't those kickbacks? Because he was directing business to the pharmacy. Your Honor, so the anti-kickback statute requires that for a criminal violation of the anti-kickback statute, the government would have to show that the defendant knew that what he was doing at the time he was doing it was wrongful or unlawful. So even if a reasonable person in Mr. Wilkerson's shoes should have known or even suspected that his behavior was unlawful, that would only make that person guilty of negligently participating in an unlawful kickback scheme. It does not prove that the defendant acted willfully in facilitating that scheme. So in addition to some of the reasons that Mr. Rosenberg touched on, a few more reasons that I can identify in the record that show that Mr. Wilkerson did not possess records of mens rea include the fact that none of the parties involved used any effort to conceal the payments that were received. The checks were written to the defendant's company and included the name of the representative, and the payments made by the company were recorded in 1099 forms that were filed with the IRS. In sum, the record demonstrates that Mr. Wilkerson fully believes that all of the actions he took were legal, and thus he could not possess a mens rea required to criminally violate the anti-kickback statute. Which brings me to my second point. In any event, the government... Ms. Stephens, it's certainly very possible in asking these questions that I might be mixing up different defendants, so bear with me for just a second. Does not the record show that one or more of these defendants advised these downstream people to set up LLCs to, quote, make it look legitimate, end quote? Your Honor, with respect to Mr. Wilkerson, all the record supports is that he suggested that a sales representative set up LLCs to receive their payments. Amanda Booker, she's a sales representative. She testified that Mr. Wilkerson suggested that she open an LLC and that he went through a lawyer to help her open the LLC. But there's nothing in the record that supports the conclusion that the LLCs were actually set up as part of a fraudulent scheme. My question was pretty narrow. Am I wrong that the record someplace shows that one or more of these people said, do that so it looks legitimate? Your Honor, I am not aware of anywhere in the record that implicates Mr. Wilkerson telling anybody to open an LLC to make something look legitimate. And you don't know whether perhaps some of the other alleged conspirators said exactly that? No, I'm not aware. All right. Thank you. My understanding of the evidence was that Wilkerson personally discussed the nonexistent clinical trials with Heather Farrar, who was hired by Wilkerson to work at Karma. And and he was, in fact, acknowledged the leader of the entire compounding marketing enterprise. Why aren't those evidence of fraud or an intentional seeking of illegal kickbacks? Your Honor, so the only evidence that Mr. Wilkerson was the, quote, brain leader of this scheme is the fact that he did own top tier, which was the company that the compounding pharmacies were contracted with. And so they negotiated the commissions, right? Correct. But again, coming back to my second point, I feel my time's expired. May I please continue? Thank you. So in this case is very similar to the case, the United States for Smiles, which is a Fifth Circuit case where they concluded that accepting per patient commission for promoting services does not violate the anti-kickback statute unless the marketers unduly influence or acted on behalf of prescribers and selecting goods or services. And here there was just no evidence that any of them, any of the physicians or prescribers ordered any of the creams based on pressure from a marketer or in any consideration other than that physician's determination that the things are medically necessary. So the pharmacies were paying Mr. Wilkerson and top tier marketers to distribute information regarding these compounds to patients who they thought could potentially benefit from their use. It was understood by the party. I have one other testimonial question. What about Wilkerson's discussing with his down links? These prescription compounds on the orders were chosen by putting the most expensive ingredients in the medication, not based on efficacy. Why isn't that evidence of fraud? Your Honor, that's what you're addressing. Yes. So Mr. Wilkerson is not a medical professional, so he does not have any sort of training or background that would allow him. He's only choosing the most expensive medications to put in the creams. He's not even thinking about medical need. He's thinking about money. Right. Right. Mr. Wilkerson is correct. Mr. Wilkerson was in doing this to make money. This was his job. But he did not have control over the ultimate formulas that were prescribed to these patients. Not as up to the provider. Nor did he have control how much each formula, how much insurance companies charged for each ingredient. That was up to the insurance companies. The choice to use only the most expensive ones in the order of their cost is evidence of his intention, isn't it? I don't believe so, Your Honor, because he did not have the authority to choose what ultimately was prescribed to the patient. Just because the ingredient was listed on the form does not mean that that was the one that had to go into the prescription that was written for these patients. Thank you. Thank you, Ms. Stephens. I think Mr. Thelman is next. Your Honor, it's Lawrence Rosenberg. Could I just for one second clarify the last answer? Because it's very important to your question. The pharmacies created those prescriptions, created those formulas. Not Mr. Wilkerson. The pharmacies created the formula. But I understood that they did it in his direction to put the most expensive ingredients in the medication on the printed form. I do not believe that's correct, Your Honor. I think the government has misstated the record on that point. We can check. Thank you. Mr. Thelman. May it please the court. My name is James Thelman. I'm with the Tampa Bay Law Firm of Kinds Markman and Thelman, and I'm here today on behalf of the appellant Michael Chatfield. And I'd like to reserve one minute for rebuttal, please. For the reasons expressed by Mr. Rosenberg and Ms. Stevens, the evidence is insufficient to sustain Mr. Chatfield's convictions. And I'm happy to answer any specific questions with respect to Mr. Chatfield. But I'm also here to argue on behalf of Mr. Chatfield, Mr. Wilkerson and Mr. Hinman. In the alternative, we think the evidence of fraud is insufficient and that the conviction should simply be vacated. But in the alternative, if there does exist some theory of fraud that this court believes is sustained by the evidence other than the theory of fraud found or used by the district court, that would require a remand for a resentencing to determine the appropriate loss figure or other guideline calculations that would be applicable to the conduct that this court then has identified as being fraudulent, if any. What we have before the court now is a finding of essentially 100 percent loss. The district court sentenced Mr. Chatfield to a 108-month sentence as a result of calculating the guidelines based on a loss figure of over $11 million, which represented 100 percent of every claim filed for every cream sold by Mr. Chatfield or anyone working under him. Because, as Mr. Rosenberg explained, the district court's theory of fraud was a failure to disclose to someone, either the insurance company or the customer, the cost of the product. Of course, disclosing to the insurance company the cost they themselves said and agreed to price probably doesn't make much sense. I think he's left. How does it fit? I think I'm correct that Chatfield was the one who had been joking around about making the cream cost $60,000, right? Isn't that evidence as to your client? Oh, I think there's an anecdote about the $60,000 figure. There was a joke he made at one point saying that all kids have scars or something to that. Now, it was not connected to any particular false claim. That's the best they had was a joke that he made to that effect. Now, if we're going to talk about the facts as to Mr. Chatfield, however, boy, I would want the court to be quite aware of our reply brief, because we felt as if the facts stated in the government's brief as to Mr. Chatfield were wildly inaccurate. Many of them were inapposite. But in any event... Mr. Feldman, if you're going to concentrate on damages, it seems to me that the guidelines are clear, that it's the aggregate amount of the fraudulent claim. And we're going to have to assume that fraud was established for purposes of this discussion. But assuming that we find that fraud was established, you use the aggregate amount unless that amount is rebutted. Now, my understanding was that it wasn't rebutted. Your friend, Mr. Rosenberg, says, well, it wasn't rebutted because the district judge didn't permit us to rebut it. But I didn't see that in the record. And I didn't have a chance to ask Mr. Rosenberg. Is there a citation or a place in the record that you can add this to? Yes, Your Honor. I would look at the sentencing of Mr. Chatfield, which is docket 547. And going into that, the briefing was pretty thorough and complete. There was an objection to the loss in writing on the grounds that not every claim was fraudulent, a citation to the Mahmoud case, which stands for that proposition. Then the matter was discussed at length with the district court. And this is where the district court was candid in explaining what his theory of the fraud was. I see that my time has expired, if I may. State your thought. I think that the back and forth, it really begins at page seven of that transcript. And it goes over on to page 14 through throughout that. What you'll see, Your Honor, is this discussion where the defendants are saying, look, we'd like to present evidence of the legitimate claims. And the district judge is saying, look, none of them could be legitimate because it doesn't matter to me if they were medically necessary. It doesn't matter to me if the claims were efficacious. It doesn't matter to me if you paid people. It doesn't matter to me if you didn't pay people. The only thing that matters to me is you didn't disclose to anybody how much these things cost. So 100 percent of these things are fraudulent unless you want to prove to me that you did disclose those things or they weren't expensive. Those are the only things you could tell me that would have any effect on my loss finding. Since you can't do those things, I will just you've made your record. You made it abundantly clear that the issue was preserved for you all to look at on appeal. And I feel very confident that the record is entirely preserved there, at least with respect to Mr. Chatfield. So one quick follow up. So I mean, I understand your theory is the district judge made it very clear he wasn't interested in such evidence. OK, I get that. Assuming that you're right about that. Did he ever say you can't put in evidence or make an offer of proof as to any of the legitimate prescriptions? Essentially. And then let me let me also back up. You essentially am I going to find language that says you can't do it because you are all experienced defense lawyers. And I know you don't just take the word of a judge when you are trying to vigorously advocate for your client. So you certainly you could have attached it to a brief. Nobody precluded you from that. You could have made an offer of proof. You could have showed it to the probation officer and the probation report. I mean, all of those things preceded this discussion you're talking about, as I understand it. They did, Your Honor. And if I if I may, Your Honor, first of all, let me also say that I do not agree with the premise of how this has been articulated in the guidelines. This premise, this this presumption you speak of only applies to government contract fraud. These are private payers. And so that presumption, the guidelines does not exist. Your case law allows the burden to shift to me only after the government has proven that the fraud is so pervasive that it applies to virtually every claim. That didn't happen here. We've got 3000 or 4000 claims. There was no extrapolation here. There was no expert here. There was just little little cherry picked examples of things that the government didn't like with one case or another. There is no evidence in this record of any sort of pervasive fraud unless one affirms the district court's finding of a theory of fraud. The only thing that goes through it all is that anything else would require a remit of your rebuttal time. Thank you, Mr. Shad. Good afternoon, Your Honor. Pleased to court this afternoon representing Casey Nicholson. And my client has a little bit of a different twist on these matters in that she was although she was charged with all the offenses, like everyone else. She was acquitted of the conspiracy in this case. And that's a really important fact, because throughout this entire case, and if you take a look at the indictment, you'll see that it runs through the indictment. The scheme to the fraud is the conspiracy in this case. And that's borne out not only in the indictment, but in the government's briefing in this matter. And even with some of the questions that have been asked by the court today, there's been this assumption that the that the conspiracy that is involved in this case is the scheme to the fraud, which is to to sell these creams. So my client stands acquitted of the conspiracy charge in this case. So what does that mean? And what does that do legally with regards to some of the other matters for which she was convicted of? So in order to prove a conspiracy at a basic level, you have to prove that there was an agreement and that you have to prove that the agree that the defendant knowingly intentionally joined up with that agreement. So we know in this case from the judge's decision, even though there are no written findings of fact, as Judge Strange pointed out earlier, we know because of the other convictions that the court did find that there was a conspiracy involved, which was the scheme to the fraud. So we know that. So the only thing that the court could have found was that my client didn't knowingly join that scheme to the fraud. So now once you take out that scheme to the fraud, that that was proven, all of the other counts for which my client was convicted of have to go away because they're all absolutely dependent upon the scheme to the fraud that was leveled out in the indictment in this case. And that's set forth in the indictment. You want to take a look on that. It's in paragraphs eight through 13 of the indictment, but it's actually labeled scheme to the fraud. And it's the allegation of the scheme to the fraud and the conspiracy. And for each one of the counts that my client was convicted of, those same paragraphs are incorporated herein as the scheme to the fraud in the indictment. So in other words, you can't get outside of those matters and that conspiracy in the allegations that the government made themselves. And then their brief, they actually double down on, take a look at page seven of their brief. They say, you know, between 2014 and 2016, the defendant survived and executed a scheme to defraud investors, blah, blah, blah, blah, blah. And so the problem here, and I see my time's up, the problem here is that once my client is outside the listed scheme to defraud, they have no other evidence to which to support that element of any of the remaining convictions. So outside the fraud actions or outside the scheme to undertake a conspiracy? It can't just be fraud. It's got to be a scheme to defraud because that's, you know, like if you go to the wire fraud count or the healthcare fraud count, those require a scheme to defraud. They don't require a fraud because that's what part of the thing that differentiates it from a lot of other fraud charges, right? And it also differentiates it from, let's say, state fraud charges. So, in other words, if my client did commit some fraud, that doesn't mean it's the federal offense of wire fraud. The federal offense of wire fraud requires this scheme to defraud, and it's the scheme to defraud that's laid out in the indictment. Thank you. Did you reserve, no reserve time? I did not, Your Honor. Thank you. Thank you so much. Ms. Mai, am I mispronouncing your name? May it please the court, John Amayo on behalf of Mr. Billy Heineman, and I'd like to reserve one minute for rebuttal. Certainly. The government is using a broad brush to make it appear here as though everyone who marketed these compounded creams is guilty of fraud. They're asking the court to take the conduct of a few and attribute it to all. When you look closely at Mr. Heineman, what you see is that he is a decorated veteran, a hard worker, a generous son and brother, and a man who got involved in what he believed was a legitimate business. The government's theory of fraud is that the defendants, each of them, submitted medically unnecessary claims. That is issue number one in their brief, and they returned to that refrain no less than 13 times throughout their pleading. There is no proof that Mr. Heineman knowingly submitted even one medically unnecessary claim. There is no proof that Mr. Heineman made any affirmative misrepresentation. As a result, his conviction should be vacated. Second, Mr. Heineman argues that the loss amount is incorrect, and I will not repeat Mr. Feldman's prior argument, but I want to note that when looking at the loss amount attributed to Mr. Heineman for the total amount of prescription, his offense level skyrocketed by 20 levels. So that without the loss amount, his guideline range would have been 4 to 10 months. With that improper loss amount, his pre-sentence report had a range of 10 to 12 years. Mr. Heineman is much more similar to the defendant in the Norris case, which is the Fifth Circuit decision we cited, which concluded that a proximity to fraud is not sufficient for a healthcare fraud conviction. There's no proof that Mr. Heineman was directly involved in fraudulent activity, that he directly observed it, or even that he deliberately closed his eyes to it. And we see that in Mr. Heineman's email to Adam Staton, who testified about what Mr. Heineman knew of the ground rules and what he told others the ground rules were. And again, there were no affirmative misrepresentations in that email, which is found at 360 in the record in Mr. Staton's testimony. What do we see Mr. Heineman saying about this enterprise? That patients who want compounded cream are connected with a nurse or doctor. That they may be prescribed a cream after speaking with a medical professional. And that the marketers do not get paid if a customer does not speak with a medical professional. There's nothing in Mr. Heineman's written, there's nothing in his words, there's no proof in the record, that Mr. Heineman suggested that someone should be paid to order a cream. That someone should be paid to be part of a non-existent study. Or that someone should offer to pay a co-pay. Ms. Miles, is there any evidence of Mr. Heineman having paid a patient? No, sir. The only proof that was submitted with respect to Mr. Heineman making payment directly to someone involved the testimony of Don Montgomery and Maria Valadez. Mr. Heineman was acquitted on those two counts. So, therefore, it's our position that that's not relevant. And there is no proof in the record that he directly paid someone for a count on which he was convicted. But he did provide the form which said that they might be paid for evaluating the product. Yes, Your Honor. I believe you're noting that in the record at 360, starting at page ID 4136. There is an email from Mr. Heineman to Mr. Staten in which his words say that there is an evaluation form which allows us that we may use if we wanted to conduct a study. And I see that my time has ended, but if I may just finish that thought. I think that that is an important point because Mr. Heineman in no way is suggesting to Mr. Staten that anyone be paid for a non-existent study. He's simply saying that we have the capability to conduct a study in the future should we choose to. But there's nothing at all to indicate that he's trying to induce someone to order a cream based on a non-existent study. Thank you. You'll have your rebuttal. Thank you. Ms. Hobbs. If that pleases the court, my name is Dean Hobbs. I represent Mr. Montgomery. I have not requested any rebuttal time in this matter. Mr. Montgomery was described by All Involved as the down-the-line marketer. The only issue here is whether he understood it was unlawful for him to receive for his marketing efforts some form of compensation. You've already heard argument regarding the men's fair requirement of an anti-kickback violation. The government has pointed to certain things that it claims evidence is Mr. Montgomery's bad purpose. Number one, the government points out that the contracts the defendants had with the pharmacies warned them about this statute. There's no proof in the record whatsoever that this down-the-line marketer had any such experience, had any such training, and certainly no knowledge of what the contracts did and did not provide can be assumed for him. Secondly, Ms. Montgomery, just referenced by Ms. Mayo, testified on behalf of the government in this matter. Supposedly, she put him on notice of the illegality of his activity. On the other hand, if you read the whole of her testimony, she encouraged him to try to sell these products. She stated she had no belief that what was going on was unlawful. She bought the products herself. She, at least on one occasion, endeavored to help him try to market them early in the game. She acknowledged her son would not have done anything to have included her in some sort of illegal activity. The government then goes on to say that the defendants were paid to, quote, effectuate a fraud scheme, unquote. The problem with that relative to Mr. Montgomery is that Mr. Montgomery had 30 counts in which he was exonerated. No fraud, no conspiracy, no attempt, no substantive fraud of any description. Rather, he was simply found guilty of receiving payments that he had admittedly received. There's no doubt about that. The judge actually went behind the verdict. I'm using his terminology, not mine. But the record does not support that somehow or the other he, along the line, obtained knowledge of his guilty mind, his guilty activities. My time is up. I'm struggling a little bit with Montgomery also because it seems like if there's adequate evidence to show the receipt of kickbacks, there would also be adequate evidence to show at least the fraud itself, even if he's outside Mr. Shadd's argument about the conspiracy. So what is it, what is your understanding of why you think, why you think there could be this positive conviction on kickbacks without any of the background information of fraud, wire fraud, mail fraud, any of the other fraud convictions? Seems to me that the facts don't match up. Exactly. Your question, in fact, restates the argument that we're making. Had he been convicted on other counts, arguably there is some assumption of a body of knowledge that he would have had. But it's not, it's just not present here. And, Your Honor, I would say that what we're dangerously close to in Mr. Montgomery's circumstance is essentially a strict liability type offense. You get the money, ergo, you've committed a crime. And that, Your Honor, is not the law. With all due respect, knowingly and willfully means something. And in Mr. Montgomery's case, it's not present. There's not sufficient proof of that fact. Thank you. Thank you. I thank Mr. McLaurin. Yes, Your Honor. Can you hear me? Yes. May it please the court. My name is Luke McLaurin, and I'm here on behalf of the United States. We ask the court to affirm the judgments in this case for two reasons. First, the government presented sufficient evidence at trial for any rational trial or fact to find the defendants guilty of the conspiracy, fraud, money laundering, and kickback offenses of which they were convicted. And second, the district court correctly determined that all the Supreme Bills submitted to an insurance as a result of the defendant's scheme were, in fact, fraudulent. And thus, properly use the total amount of those bills to calculate Wilkerson, Chatfield, and Hindman's loss amounts under the sentencing guidelines. Mr. McLaurin, how do you respond to Mr. Rosenberg saying that if there was something amiss with any of these prescriptions, it was a very, very small amount, and the government knew that, and you've been overstating what happened here? Well, my response to that is he's simply wrong. I mean, that's not what the evidence of trial showed. The evidence of trial showed that the vast majority of these prescriptions were, in fact, fraudulent. I believe counsel stated that it was only a dozen or maybe a few. What the testimony was from Heather Fryer and from Ms. Magnuson and from Ms. Craven was that there were stacks of prescriptions. We're talking about an inch to an inch and a half thick stacks of prescriptions that were handed, that were being given to Michelle Craven to sign without seeing any patient. And that was on 10 separate occasions. So we're talking about probably at least 100 of those on each one of those occasions over multiple different occasions. And Ms. Craven, Michelle Craven testified at trial that there was, you know, there was, this went on for a while, but even when it got to the point where she insisted that she have some sort of contact with the patients, she herself testified that her contact was minimal, that she described it as contact that did not even create a doctor-patient relationship. She said that she maybe talked to them for at most two minutes. We also had testimony from some of the people who she talked to. Zach Rice, one of the people who she talked to, testified that when he had a conversation with her, the conversation wasn't about whether he needed creams. She was just confirming that the order was correct, that what was listed on the form was what he wanted. That's not a doctor-patient relationship. The suggestion that Ms. Craven exercise proper medical judgment was refuted by Ms. Craven herself when she testified at trial. She said, I didn't do anything that I would need to do to have a doctor-patient relationship with any of these individuals, even the ones that she spoke to. She also testified that in terms of the number of prescriptions that were clearly signed without seeing any patients, that was the substantial number. Again, stacks of prescriptions, multiple times. This is all on the record. I point the court in particular to pages 2794 to 2800, 2908 to 2909, where Ms. Craven was talking about how Wilkerson offered to pay her to sign prescriptions without seeing patients. She agreed. She talked about the number of times that he came in with the stacks of prescriptions. Her testimony was backed up by Magnuson, Heather Magnuson, who worked at Balanced Life. She said that Wilkerson came in several times with these stacks of prescriptions. There were several times he came in with stacks that she noticed had a stamp signature on them and that he didn't even see Craven the day he came in with the stamped prescriptions. He just went directly to Magnuson and told her to fax those over. There's testimony that not only were there prescriptions being issued by Craven, who herself admitted that she hadn't done any of the things she was supposed to do, but also that Wilkerson himself was bringing in prescriptions with a stamped signature that Craven had no knowledge or idea that this was going on. The suggestion that this was simply a small amount of prescriptions is belied by the record. That's simply false. Let's take the other side of the coin. Was there any evidence offered by either the government or anybody else that any of these prescriptions were actually were valid, that somebody wanted them and they needed them? No, there was no testimony that any of these prescriptions were valid. There were a few customers who testified that they could have had a need for something like this and that they found some of these things helpful. But even those customers specified that the medications were just as effective or about the same amount of effectiveness over the counter products. I'm not trying to change anybody's burden here, but the defendants say that the judge precluded them from offering any evidence that any of these prescriptions were valid and actually necessary and requested. So what's your response to that? That's inaccurate as well. There's nothing in the record that shows the defendants were precluded from offering this evidence. In fact, the court asked them if they had some evidence to provide. He was just explaining that in his view, and this was correct, that the entire operation was a fraud. And the reason that the entire operation was a fraud is because the defendants were essentially targeting the procedures that are in place to ensure that you have medically necessary prescriptions. And they were manipulating the process such that none of these prescriptions were medically necessary. But he did offer them the chance to put on evidence and they didn't. I would specifically note with Mr. Wilkerson, he actually never requested to argue, and he didn't argue below, that there were any legitimate prescriptions. His argument about loss calculation below was entirely different. His argument was that loss calculation should just be based on the total amount of gain that he had as opposed to the total amount of fraudulent bills. The district court correctly said that is not what the guidelines say at all. And that's the only argument he made. He never made an argument that there were legitimate claims. So to the extent that he's now raising that on appeal, that's being reviewed for plain error. But the district court never precluded them from presenting evidence to show that these claims were legitimate. They just simply didn't have any evidence to show that these claims were legitimate. I'm sorry. If you want to finish your thought on that, I wanted to ask you about a different area. Please, Judge. I'm here to answer your question. I just wanted to get into the duty to disclose, which there's been a lot of argument about from the defendants regarding the duty to disclose the cost of the prescriptions to the patients. Their argument is that there has to be some sort of a duty before that's considered fraud. What's your answer to that? Well, I think my answer would be twofold. First, as a general matter, you don't have to have a duty to disclose for concealment of material information to be fraudulent. That's actually well established in this court's cases. In particular, I think the Bertram case is probably the most useful here. There you have a situation where the individuals in that case didn't have any particular duty to disclose the fact that they weren't conducting urinalysis tests in a timely fashion. They were just concealing that information, and that's what made it fraudulent. It's because, particularly in the healthcare context and prescription context, insurers rely upon these independent gatekeepers. They rely upon gatekeepers like medical professionals, and there is a trust that is built into the system that people are operating in good faith. And the problem here that I think the district court rightly identified is that these defendants were interfering with that system. They were interfering with the gatekeepers that are ensuring that these prescriptions are, in fact, medically necessary. With regard to the specific district court... Just take the next step. So they're interfering with the process. How does that, or what is it about that that rises to the level of fraud or a conspiracy of fraud? Well, I think what is fraudulent about it is several things. One, they're paying patients to order prescriptions. That's creating a financial incentive for patients to order prescriptions that they don't need. They're, in fact, encouraging patients to order prescriptions that they don't need. They are also paying healthcare providers to write prescriptions without seeing patients. They're stamping prescriptions with a healthcare provider's signature without authorization or approval. They're designing the formulas for the compounded mitigations in a way that has nothing to do with medical necessity, but has most to do with maximizing profit. And all of these things are information that they're concealing from the insurers. So by submitting this claim for reimbursement to the insurers, they're functionally representing that this is a legitimate claim. But it's not, and they know it's not because they've been interfering with the process all along. And they've been intentionally interfering with the process in order to line their pockets with ill-gotten gains. And that's exactly what fraud is, is that they are making misrepresentations, they're being deceptive, they're being dishonest. As this court has stated in the past, you know, fraud, there's not a technical, like, specific standard when it comes to fraud. When we determine fraud, we look at a general standard about moral uprightness, fundamental honesty, fair play, right dealing. There's a lot of different ways in which activity can be deceptive. Let me ask you this about the cost. I mean, we see advertising for medical products all the time, you know, on television and whatnot. I never hear them talk about what the cost is in that advertising. Does that make it fraudulent advertising? Do they have an obligation in the advertising that we get on television for pharmaceutical products to say what the cost is? No, it's not fraudulent. I'm trying to understand why there was an obligation in this context to say what the cost was for the... I don't think there was necessarily an obligation to say what the cost is. I think you have to look at the district court's comments. Isn't that what the district court said the basis was for the fraud here? No, your honor, respectfully. I think if you actually look at what the district court said, the problem that the district court found was not the nondisclosure of the cost, but the cost in relation to the medical value of the creams. And that gets at the core of the fraud. Shouldn't that always be alleged against any kind of advertising for pharmaceutical products? You never hear about the relationship of the cost of pharmaceutical products to what you're being charged in the market. That's just never part of the disclosure. You hear all sorts of disclosures at the end of those advertisements, but you never hear that. So why should it be required here? It would be fraud in this context when it's not fraud in that context. If your honor, I can explain by explaining that what's important to remember what we're dealing here is compounded medications. They are medications that are supposed to be specifically tailored for a particular patient's unique medical needs. They're also only supposed to be prescribed and only supposed to be approved if traditional standard medications are not available or are not effective for that particular patient. That's why in the court in focusing on the excessive cost relative to the medical value was really getting at and understanding the core and the essence of the fraud here. Is that these defendants were passing off these things as compounded medications when they really weren't. I mean, these were things that there was no medical necessity for. That to the extent that there were any patients that actually had legitimate needs for some of these creams, their needs could have been addressed by standard medications much more effectively. That is what the evidence of trial shows. I agree the district court's comments at sentencing were quite inartful, but I think they accurately captured the essence of the fraud here, which is that these defendants were hiding the fact that these compounded creams were, in fact, not medically necessary. Should not have been approved as compounded medications. As the district court put it, their cost was disproportionate to their medical efficacy. Standard medications could have been just as effective. And so that was one of the reasons in which why the submission of these prescriptions was fraudulent. I would also point out that the. Mr. McLaurin, would one way perhaps to be looking at this is that the advertising that we see on TV, at least as far as I am concerned, is directed at patients who have certain conditions. What did the evidence here show as to whether there was any attempt to find people that actually had these conditions as opposed to finding people that had insurance that would pay for compounding drugs? Well, the evidence showed that it was the latter, that the defendants here were not in any way focused on getting people who had particular conditions. The instruction was always focus on people who have this particular insurance, focus on people who have insurance that will quote unquote pay out for the creams. And that is, again, also indicative of the fraud in this case. But what they're focused on is patients who have insurance as opposed to patients who have a need. And another difference I would point out between, you know, your standard pharmaceutical advertisements that you see, even when they're directed to patients, is they say, go talk to your doctor about this medication. Like, we think this medication is great for you. Go talk to your doctor. They don't say, go order this medication and then we'll send you $100. That's not what they say. But that's exactly what the defendants did here. They went to people and they say, hey, order this and we're going to give you money. And then to try and make it look legitimate, they falsely describe that payment as it's a payment for a fee for participating. As far as the supposed clinical trial that never occurred or evaluation that never occurred, the defendant's answer is, well, it's not really fraud because it could have occurred. We just didn't have enough time, I guess, for it to occur. But what about in a normal situation, maybe not a normal situation, but can there be a situation where a drug company pays individuals to evaluate their product after they've used the drug? Yeah. That's an awful situation. That could be an awful situation. But as was testified to by the experts in this case, those studies are usually set up in advance. They're approved by insurers. Insurers have knowledge of it. Nothing about that is concealed from the insurers. They're involved in the process of that. And, in fact, insurers like to promote those things because they want to understand the efficacy of products. But that's not what happened in this case. I mean, I agree, Your Honor. There are situations where studies can be legitimate. That's not what was going on here. What about the lower-level marketer here? Say, for instance, I guess the lowest would be Montgomery, I guess. Is it possible that the lower-level people might have less knowledge of that, of whether or not it's a legitimate study or not? Well, I think we have evidence. There was evidence at trial of what the low-level people understood. I think I would point the court in particular to the testimony from Joshua Morgan, who was one of Mr. Chatfield's underlings, and he specifically testified, if you look at page 5649 in the record, that the purpose of making these payments was to get folks to sign up. He also testified, if you look at page 5697 in the record, that they were not marketing creams. What they were marketing to people was $300 a month. They were marketing that you'd get a payment if you just sign up for this stuff. And so I think the evidence at trial shows that everybody involved here knew that these offers of payment about the study, that was just a ruse to assure patients and make it seem like the payment that they were giving patients was legitimate. And that, again, goes to the whole essence of the fraud here. Now, there were several – there was another point that I wanted to – Is the distinction you're drawing between saying there will be a study in which you can join and one of the higher-up persons in the conspiracy speaking to a downlink and saying, just tell them that there's going to be a study? Is that the distinction that makes it fraudulent? I think what's fraudulent here is that the defendants were knowingly – they were paying these people to order the creams. And they were – the creation of the study, they were falsely informing people about the study in an act of deception to try and make customers think that the payment that they were giving them had some basis of legitimacy, when the defendants themselves knew that it did not have any basis of legitimacy. And we believe that the evidence supports that conclusion. Well, if the evidence on, say, Mr. Montgomery supports that conclusion in order to show that his conviction of receipt of kickbacks, I'm a little at a loss to understand how he can fall solely in that category if you're claiming that that is the evidence that shows that there was a conspiracy and healthcare fraud and wire fraud and mail fraud, too. Why wouldn't he have been convicted of those also? Well, that is an excellent question, Your Honor. I mean, frankly, in my mind, he probably should have been convicted of those offenses as well. But the court's task here is not to answer – to ask why were defendants acquitted of certain charges. The question on sufficiency review is, is the evidence sufficient to support the charges of which they were, in fact, convicted? And the answer to that is yes with regard to Mr. Montgomery and the receipt charges. He doesn't dispute that he received these – that he received these commission payments. And we believe that the evidence shows that he knew exactly what they were for. He knew that these payments were for referring individuals to these pharmacies to get these prescriptions. And he was, in fact, warned by his mother that doing that could be problematic when you moved over and were dealing with TRICARE. I know counsel for Montgomery suggested, oh, well, she was involved with him in the fraud. But she specifically testified – I mean, she was involved in the private insurers. She told them, hey, when you're going over and doing this with the government, you've got to be careful. That's probably illegal. And then there's also evidence that Montgomery was aware that other individuals had concerns about this arrangement. Adam – Satan testified that he had concerns about the legitimacy of the operation and asked to have a meeting set up with lawyers. Montgomery was at that meeting with lawyers, and Satan testified that he came out of that meeting and he was not satisfied after speaking with the lawyers. Now, we don't have the content of the meeting because the defendants refused to – they didn't ever present an advice of counsel defense. They refused to waive attorney-client privilege in order to do so. But that evidence indicates that Montgomery was aware that there were concerns about the legitimacy of this operation. There's also evidence to show that Montgomery knew what was going on here was deceptive. Zach Rice testified that Montgomery told him to tell the military members to have their spouses and their children order creams under the service member's name so as to avoid having to pay co-pays. That's clearly deceptive conduct. Montgomery knew that that was going on. Montgomery also, when – Katie Calloway testified that when she was approached by an FDA agent who was investigating this, she contacted Montgomery and he said, don't talk with the agent, get a lawyer. Now, that's evidence that somebody's aware that their conduct is probably wrongful, probably illegal. Moreover, when Calloway was talking to the FDA agent, she actually texted Montgomery during the course of that interview. And she told Montgomery, hey, what's going on? I got these cream prescriptions and I never spoke to a doctor. And then Montgomery texted her back and tried to make her think that she did speak with the doctor, that he was trying to plant in her head an idea that she had actually spoken with a doctor when she knew she hadn't. And I think this all goes to show Montgomery knew what was going on. He knew the purpose of these payments. He also knew that there were creams and pills being ordered for people without their knowledge and consent. Zach Rice testified that when he received $5,000 worth of wellness pills, he called up Montgomery and said, wait a minute, I never ordered these things. Montgomery said, well, that's just simply part of the order. There's lots of evidence that Montgomery knew what was going on. He understood why he was receiving these payments. And we think that evidence supports his conviction. Why he wasn't convicted of the fraud charges is not an issue that's in front of this court. With regard to Mr. Nicholson, I think the argument was that the defendants were arguing that there has to be a scheme to defraud in order to sustain a mail and wire fraud conviction. Do you agree that there has to be a scheme to defraud? Absolutely. It's an essential element of defense. And then how would you, what's the evidence that Nicholson would have been violated or established that element of fraud for him? Well, for Ms. Nicholson, I mean, I would point out that the law doesn't require one to be the instigator of the scheme. It simply requires one to willfully participate in a scheme with knowledge of its fraudulent elements. And that's exactly what the evidence showed in this case with regard to Ms. Nicholson. There was testimony from Matthew Perkins that, you know, she told him to, you know, get people to sign up for these creams. She said, do whatever you have to do to get people to sign up. She told Matthew Perkins to focus on scar pain and wellness creams because they were the ones that paid the most. She and Wilkerson had a conversation with Perkins where they explained that what they were doing was putting the most expensive ingredients in the creams to make as much money as possible. There's also evidence that Ms. Nicholson knew about this arrangement with Ms. Craven. She was received the testimony at trial, particularly page 6722-23 in the record. It shows that all of the defendants, Ms. Nicholson, Mr. Hinman, Mr. Chatfield, they were all having money withheld from their commission payments in order to pay Michelle Craven for her services. So they were all aware of this arrangement that was going on with Michelle Craven, that these prescriptions were being written for people without authorization. I think one more point I'd make about Ms. Nicholson is that she in fact bragged at one point to Mr. Perkins that she paid a friend's insurance premiums for a whole year because, quote, she could make that amount of money back in two months. I mean, this is clearly somebody who knows about the scheme, is involved in the scheme, and wants to reap the benefits of the scheme and did reap the benefits of the scheme. Mr. Chad's argument that somehow you have to ignore the evidence that she was involved in a scheme to defraud because she was acquitted of conspiracy simply makes no sense. It appears that he's arguing for an inconsistent verdict theory, but he never presented that argument in his brief. And there's really not evidence to support that here. Again, we don't know why she was acquitted of the conspiracy charge. Then that's not the question in front of the court. The question is, is there evidence? I thought you just said that the scheme to defraud is an element, a necessary element of proof. It is, and she was involved in a scheme to defraud. Whether she also conspired to commit a scheme to defraud is a different question. And this court is not here to answer why she was acquitted of that offense. The question is whether there's sufficient evidence to show that there was in fact a scheme to defraud that she knowingly and willfully participated in. And the answer to that question is yes. She participated in the same scheme that the other defendants participated in. She reaped substantial profits from that scheme. The fact that she was acquitted of a conspiracy, it simply shows that, I mean, we don't know. It doesn't really show anything. And again, that's not the question in front of this court is why she was acquitted of that offense. It's whether there's sufficient evidence to show that she was to affirm her conviction for the scheme to defraud that she was involved in. Well, essentially, the defendants are arguing that the scheme and the conspiracy are one and the same. You can't have one without the other. And I think that's what we're getting to here. So how do you advance the argument that you can be acquitted of conspiracy but still be part of a scheme? Well, I mean, you can be acquitted of conspiracy because the judge wanted to have leniency. I mean, like, you could also, I mean, a conspiracy also has slightly different elements. It requires an agreement among people to violate the law. So you can have a scheme going on without necessarily having, you know, everybody in agreement that they all are necessarily going to be involved in the scheme. But you can have some people taking advantage of the scheme. So in essence, you're saying that she was part of the scheme even if she wasn't part of the conspiracy. Absolutely, Your Honor. She might not have had an agreement with anybody else, but she was still part of the scheme. Absolutely, Your Honor. And again, we don't know why she was acquitted of conspiracy. It could have been simply, you know, fact finders are permitted to acquit simply as a matter of leniency. The court could have simply thought, well, I've already convicted her of the fraud charge or the scheme to defraud. I don't want to add a conspiracy charge as well. That's certainly possible. We don't know. But again, that's not the question in front of the court. Why was she acquitted of certain offenses? It's whether there's sufficient evidence to support the convictions for the offenses of which she was actually convicted. Finally, I'd like to respond. There was a point made about these comments that the district court made at sentencing, and I have two responses to that. One, which we've already touched on, which is that even if you look at the comments, they are consistent with the verdict because, while inarticulate, they do show an accurate understanding of the essence of the fraud. But another point I would like to make with regard to the comments is that it's something that I think you hinted at earlier, Judge Strange. These comments shouldn't even really be considered when evaluating the sufficiency of evidence because they were not meant as a Rule 23C explanation of the verdict. The defendants had an opportunity to get that explanation, and they waived it. And when we're in a situation like that, the rule is we treat a bench verdict the same way we treat a jury verdict. We don't inquire as to, you know, how the court reached the verdict. We simply look at all the evidence in the record and assess, is that evidence sufficient to support the convictions? And the other reason I don't think we should look at the district court's comments as announcing any sort of Rule 23C findings is the court itself said that that's exactly not what it was doing. It explicitly disavowed that. It said, no, I'm not issuing a full explanation of my verdict. You had the chance to request that, and you waived it. The court's comments are best read as what they purport to be, which is a response to the specific sentencing arguments that the defendants were making. And I think that response, in response to what the court was showing, is that this entire scheme was fraudulent. The scheme was fraudulent because the defendants were targeting and manipulating the process by which the medical necessity of these compounding claims could be determined. And so because there was no legitimate basis for any of these claims to have been issued, the entire scheme was fraudulent. That there was no, I mean, none of these claims were legitimate because the very process for determining their medical necessity was interfered with by these defendants. By paying prescribers to just issue the prescriptions without seeing any of the patients. By paying patients to order the prescriptions for which they had no need or desire. By manipulating the formulas to ensure that they weren't designed for any specific medical need of the patient, but rather to enrich the defendants. At bottom, what we have is a very extensive scheme to defraud. These defendants were properly convicted for their involvement of it and for their payment of kickbacks. And we ask the court to affirm their convictions and sentences. Unless there are any other questions, we'll rest on our brief. Other questions? I think it's rebuttal time, Mr. Rosenberg. You're on mute. Yes, I have a few points to respond to. The first thing I want to say is the judge said what he said. He said he did it so that this court on appeal would know what he was doing. He also said something critically on the record, 573 page 11961. He said some of the issues presented in this case on which the court made rulings required it to make judgments with jurists of reason could differ. That is not guilt beyond a reasonable doubt. And given that, that alone should require a remand in this case. Secondly, Mr. McLaurin said that there was a lack, that there's not even a need to have a duty disclosed and cited the Bertram case. That case had nothing to do with whether there was a duty affirmatively or not. Your analysis in that case was completely unnecessary because it was done months after it was ordered and was therefore useless. That's why there was fraud in that case. Here, there was no duty to disclose, nor should there have been, given how heavily regulated this industry is. Next, with respect to the study, I want to make very clear that while Mr. Wilkerson did have discussions very early on about the possibility of a study, there is no evidence in this record. None that he directed people to tell patients that there would be a study or that he directed people to have payments made for a study. No connection between payments whatsoever. Here, Kurtz testified that he knew Wilkerson was not paying people for a study or telling people to pay people for a study. Fourth, with respect to medical necessity and Nurse Craven's testimony, I urge the court to reread her testimony as I did last night. In it, she makes very clear that she did see, she did talk to patients, not just for two minutes, but between two and 20 minutes. She testified that for most of the patients, she did everything she was supposed to do. She testified that there were only early instances where she signed prescriptions where she hadn't seen patients. And Fryer testified only as to one instance where one small stack of prescriptions was stamped, and she didn't know whether Craven authorized that or not. I see my time is running out. Could I make just one or two quick points? Very quickly. OK, I would just say that on the whole, the evidence here with respect to affirmative misrepresentations is few and far between. As Mr. Feldman made clear, it wasn't the basis of the court's ruling. If this court is inclined to believe that the affirmative misrepresentations to justify fraud, at minimum, it requires a remand. It cannot be sustained on this record, given what the district court judge said and given what evidence the government actually put in. They didn't present an expert. They didn't tie this together. They just had anecdotal evidence of a few instances where things may have been done improperly. That might substantiate a civil claim, but not criminal liability. Thank you for your argument. Mr. Feldman, I think you have one minute also. It pleased the court. I want to address the factual issue. Mr. McLaren said that the vast that he proved the vast majority of the scripts were fraudulent. In response to Judge McKee's question, he said there was no testimony that any of these scripts were valid. That's absolutely a falsification of this record. Heather Fryer and Ms. Booker both testified. Chatfield specifically instructed them to only sell creams to people who needed them. Ms. Rice testified the pain creams worked. The Valades children had conditions for each cream and they worked. Dawn said her and her grandkids used the creams and they worked. Perkins used the pain cream and it worked. Craven said she wrote scripts for customers who needed and liked the creams. McGowan said the scar cream worked well. Burnett only asked for scar and stretch mark creams because that's what she wanted and needed and used them and they worked. Quincy selected only the creams he wanted and the pain creams worked. Mr. McLaren's representation of the record is false. Mr. Chatfield had no idea what was going on with Nurse Craven and there's no evidence that he did. For all he knew, there was a real doctor seeing real patients signing real prescriptions and there's no evidence to the contrary. Judge McKee, on the preservation point, I don't think we could have preserved it any better than the parties did in Mahmoud. We made the same objections that were made in Mahmoud. The record in Mahmoud was sufficient to reverse. On the lost methodology, a remand is required. I heard Mr. McLaren to just admit that the primary theory of the district court was wrong, that there was a duty to disclose to the customers. It couldn't have been. You rule that there's a duty to disclose price to customers. You have rewritten the law of health care in this nation. We thank you for your argument, I believe. We've got one more rebuttal on behalf of Mr. Hinman. Thank you, Your Honor. Judge Stranch asked the government, how is this fraud? To which the government just responded, it's paying patients to order, it's encouraging patients to order, it's paying Candace Craven to prescribe, stamping prescriptions, and designing formulas. There is no proof in the record that Mr. Hinman is responsible for any of the conduct that the government just outlined is fraudulent in this case. When the government says that Mr. Hinman was one who was paying commissions or paying Ms. Craven directly, that is a misstatement of the record. Document 45 is a text from Wayne Wilkerson to others about payments to Craven. Mr. Hinman is not mentioned in that text. He is not a party to that text. There is no evidence that he ever paid Ms. Craven. There are several people connected to the military, namely Josh Flynn, Zach Rice, and James Allen, who testified they had pain, they had a need for pain cream, and that it was effective. And that was part of the reason why Mr. Hinman got involved, to Judge McKee's point about targeting people with conditions. He got involved because he felt that this was a safe and effective way for people in the military to manage their pain and not become addicted to opioids. Thank you. Thank you. Thank all of you for your briefing and your arguments. We particularly say thank you to Mr. Hobbs for his CJA work, Mr. Rosenberg, and we welcome our law student here today and thank you all for arguing and working on this case in the capacity of a criminal justice attorney representing someone who needed representation. It makes our system work. So thank you all.